

# OFFICE OF
# THE ATTORNEY GENERAL
## AUSTIN, TEXAS

PRICE DANIEL
ATTORNEY GENERAL

May 14, 1947

Honorable Ernest O. Thompson
   Chairman
Honorable W. J. Murray, Jr.
   Commissioner
Honorable Olin Culberson
   Commissioner
Railroad Commission of Texas
Capitol Station
Austin, Texas

Opinion No. V-197

Re: Is the Railroad Commis-
sion of Texas empowered
under Article 6008,
V. C. S., to amend a
gas proration order for
the Carthage Field,
thereby permitting the
balancing of over and
under production for a
period of a year with
proviso. And related
questions.

Dear Sirs:

We have your letter of March 1, 1947, read-
ing as follows:

"This Commission has held extensive
hearings looking to the entry of a feasible
plan of proration for the Carthage Gas
Field, Panola County, Texas. Many wit-
nesses have been heard and considerable
evidence offered, in support of an order
containing provisions substantially as
follows:

"'(B) Underproduction:

"'(1) In the event there shall not be produced from any gas well in the Carthage Field, during any one month, as much gas as is allocated thereto under schedules of well allowables issued under orders of the Commission, the operator of any such well shall be permitted to carry forward to the succeeding month, as allowable gas to be produced during the succeeding month from such well, the amount of such month's underproduction for that well.

"'(2) If, during any succeeding month, all such underproduction carried forward from the preceding month for any gas well is not produced during such succeeding month, over and above the current monthly allowable of such well as shown by the Commission's schedules, then the amount of such underproduction so carried forward and remaining unproduced at the end of the succeeding month, may be carried forward to the succeeding months, as allowable production over and above the allowable for such well as may be shown by the Commission's schedules.

"'(3) Any well incapable of producing its scheduled allowable shall have assigned as an allowable that quantity of gas that it can deliver in a 24 hour period against the pressure existing in the pipe line to which it is connected. Such well will be given preferred treatment to the end that its current allowable may be produced monthly since such well is incapable of making up any underproduction.

"'(C)  Overproduction:

"'(1) Except as hereinafter provided each operator of each gas well in the Carthage Field, which is over-produced at the end of the calendar month, shall so operate such well during the succeeding month so that the total production from such well for the two months' period is not in excess of the total allowable of such well for the two months' period.

"'(2) To facilitate the purchase of gas from any gas well any operator, upon certification of necessity by his purchaser to the commission, can continue to overproduce any well, beyond the limits of Paragraph C (1) providing the overproduction does not exceed six (6) times the current allowable, and further providing that any well overproduced by any amount will have its cumulative production balanced with its cumulative allowable within one year after the first day of the first month when such accumulated overproduction began. No well shall be permitted to produce during any month a total quantity of gas in excess of two and one half times its current monthly allowable.

"'D) Ratable Take:

"'It is the intent of this order that each well in the Carthage Field will produce ratably with every other well and all preceding regulations are designed to this end; and each purchaser shall take gas ratably from the wells to which it is connected.

"'Any operator of a gas well in the Carthage Field may call the attention of the Commission to conditions in the Field that result in un-ratable production of gas from gas wells therein. Upon taking evidence in a hearing, the Commission will take any action deemed proper to restore ratable production.'

"The present basic order for the field provides as follows:

"'Underproduction.

"'1) In the event there shall not be produced from any gas well in the Carthage Field, during any one month, as much gas as is allocated thereto under schedules of well allowable issued under orders of the Commission, the operator of any such well

shall be permitted to carry forward to the succeeding month, as allowable gas to be produced during the succeeding month from such well, the amount of such month's underproduction for that well.

"'(2)  If, during any succeeding month, all such underproduction carried forward from the preceding month for any gas well is not produced during such succeeding month, over and above the current monthly allowable of such well as shown by the Commission's schedules, then the amount of such underproduction so carried forward and remaining unproduced at the end of the succeeding month, may be carried forward to the next succeeding month, as allowable production over and above the allowable for such well as may be shown by the Commission's schedule, all subject to the limitations imposed by the next succeeding paragraph hereof.

"'(3)  No operator shall ever be permitted to carry forward as allowable production for any gas well, any underproduction of gas from such well incurred during a preceding month, or months, in excess of the current monthly allowable gas allocated to such well, as shown by the current Commission's schedule of well allowables.

"'(C)  Overproduction.

"'(1)  Each operator of each gas well in the Carthage Field, which is overproduced at the end of the calendar month, shall so operate such well during the succeeding month so that the total production from such well for the two months' period is not in excess of the total allowable of such well for the two months' period.

"'(2)  Any gas well which, at the end of the calendar month, is overproduced to the extent that its production during that month is in excess of the allowable for such month, plus the allowable for the succeeding month, shall be shut in until its accumulated allowable, from the first

day of the calendar month in which such
overproduction occurred, is equal to its
total production since that date.'

"Under the present order the Commission
prorates the production of gas from the Car-
thage Field by determining monthly the market
demand for gas based upon the nominations of
purchasers and other information. When the
market demand has been ascertained, a pro-
portionate part thereof is allocated, ratably,
to each well connection in the field based
upon an allocation formula not here involved.

"Under the portion of the present order
above quoted, a well is permitted to overpro-
duce during any one calendar month provided
such overproduction is made up during the
succeeding calendar month 'so that the total
production from such well for a two months'
period is not in excess of the total allow-
able of such well for the two months.'

"Evidence has been offered the Commis-
sion that this 60-day period has not sufficient
flexibility to care for the requirements of
all gas lines during the seasonal highs. For
example, a particular line taking gas from
certain connections in the field will have in
the winter months a demand for considerably
more gas than allowed to its well connections;
in the summer months the demand on this line
will be less than the allowable of its well
connections. In other lines from the field,
the converse is true. The various pipe lines
are not interconnected as the pressures in
the lines differ. Without regard to the dif-
ficulty of working out the conflicting con-
tractual rights involved, it has been esti-
mated that a very considerable amount of money
would be required completely to interconnect
all of the lines and wells in the field and
install the required measuring devices and
compressors. The proposed plan of proration
has been offered to the Commission for con-
sideration as designed to eliminate these
difficulties by providing a 'banking system'
of gas withdrawals whereby overproduction
will be permitted for a six months' period

provided such overproduction is made up during the succeeding six months' period.

"The Commission understands that before any such plan of proration can be authorized for the Carthage Gas Field, the Commission must find that the plan will not cause waste, and will either prevent waste or protect correlative rights and promote the ratable taking of gas.

"It has been suggested, however, that although the Commission may make these necessary findings, nevertheless, the proposed plan and order might be unlawful under the provisions of Article 6008, V. A. C. S.

"The opinion of the Attorney General is therefore respectfully requested in answer to the following question:

"Is the Railroad Commission of Texas empowered under the provisions of Article 6008, V. A. C. S., to enter a gas proration order for the Carthage Field containing provisions substantially in keeping with the proposed plan outlined in this letter, provided the Commission finds that the plan is necessary to prevent waste or to protect correlative rights and promote the ratable taking of gas from the field?

". . .

"The further opinion of the Attorney General is respectfully requested in answer to the following questions:

"(1) Would an order containing the language in '(B) Underproduction' and containing the three paragraphs therein noted, on page one thereof, be violative of the court's decision and the Commission's orders with reference to 'back allowable'?

"(2) Would an order containing the language in '(C) Overproduction' and the

following two paragraphs be violative of
Section 16, Article 6008, Revised Civil Stat-
utes, and of the Commission's order in Oil
and Gas Docket No. 108, dated December 10,
1935, titled 'Special Order Fixing the Allow-
able Production of Sweet and Sour Natural
Gas in all Districts in Texas Except the
Panhandle District'?"

We reword for clarification the problem you
have in the Carthage Field.

There are several outlets (pipe lines) for the
Field. Some of these outlets have a constant daily de-
mand or load factor. The other outlets vary with the
weather, i.e., one has a demand varying from practically
zero in the summer months to in excess of 40 million cubic
feet per day in the winter months. Under the present
method of proration the pipe lines with the constant
daily demand cannot in the winter months (because of the
increased demands of the pipe lines having seasonal de-
mands) take all of the allowable gas from its connections.
In the summer months, those pipe lines do not have suf-
ficient allowable for their (constant) requirements be-
cause of the low demand of the lines with the seasonal
demands. And on the other hand, the pipe lines with
seasonal demands cannot in the summer months take the
allowables assigned to their connections, while in the
winter months, the allowables are not sufficient to meet
their market demand.

We have given your request extensive and studied
research, for we are informed that the operators and royal-
ty owners favor the proposed amendments, and by these amend-
ments you seek to alleviate the operating problems encoun-
tered in the Carthage Field. It is only after this study
and our conclusions that we proceed with this opinion. It
is without the province of your Attorney General to make
the law. Our duty is to enforce the law and to interpret
it for your guidance.

The Legislature in the exercise of its power
has passed regulatory measures to protect correlative
rights and prevent the waste of natural gas in this
State. Title 102, V. C. S. A consideration of these
legislative acts discloses, we think, a realization by
the Legislature that due to the magnitude and multi-
plicity of problems encountered in the production and

conservation of oil and gas, it was the clear and express purpose and intention of the Legislature to vest in the Commission broad and discretionary power and authority to carry out the duties imposed upon it. Compare Danciger Oil & Refining Company v. Railroad Commission (Civ. App. 1943), 49 S. W. (2d) 837, 840, rev. on other grounds (Sup. Ct. 1933), 56 S. W. (2d) 1075. We recognize further that "It is utterly impossible for the Legislature to meet the demands of every detail in the enactment of laws relating to the production of oil and gas . . . and (the Legislature) has authorized the Railroad Commission to handle the details relating to the preservation and conservation of the natural resources of the State." Corzelius v. Harrell (Sup. Ct. 1945), 186 S. W. (2d) 961, 964.

Nevertheless, the broad power of the Railroad Commission to act in these matters is limited by certain specific legislative provisions. Certain acts were passed by the Legislature which specifically declare the public policy of this State with respect to the development and protection of natural gas and establish primary standards relating to such policy and place the duty upon the Commission to carry out the detail under the several provisions of the statutes. Compare Brown v. Humble Oil & Refining Co. (Sup. Ct. 1939), 83 S. W. (2d) 935, 940-941; Corzelius v. Harrell (Sup. Ct. 1945), 186 S. W. (2d) 961, 964.

Sections 10 and 11, Article 6008, V. C. S., provide as follows:

"Sec. 10. It shall be the duty of the Commission to prorate and regulate the daily gas well production from each common reservoir in the manner and method herein set forth. The Commission shall prorate and regulate such production for the protection of public and private interests:

"(a) In the prevention of waste as 'waste' is defined herein;

"(b) In the adjustment of correlative rights and opportunities of each owner of gas in a common reservoir to produce and use or sell such gas as permitted in this Article." (Emphasis supplied).

"Sec. 11. The Commission shall exercise the authority to accomplish the purpose designated under item (a) of Section 10 when the presence or imminence of waste is supported by a finding based upon the evidence introduced at a hearing to be held as herein provided.

"The Commission shall exercise the authority to accomplish the purpose designated under item (b) of Section 10 when evidence introduced at a hearing to be held as herein provided will support a finding made by the Commission that the aggregate lawful volume of the open flow or daily potential capacity to produce of all gas wells located in a common reservoir, is in excess of the daily reasonable market demand for gas from gas wells that may be produced from such common reservoir, to be utilized as permitted in this Article."

By Section 10, supra, the Legislature mandatorily instructed the Commission to "prorate and regulate the daily gas well production from each common reservoir" to the ultimate ends of the prevention of waste and the adjustment of correlative rights. Section 11, supra, defines the conditions precedent to the exercise of authority allowed in Section 10.

Section 12 of Article 6008, V. C. S., provides as follows:

"Sec. 12. On or before the twentieth (20th) day of each calendar month the Commission shall hold a hearing after notice has been given, as provided by law, for the purpose of determining the aggregate daily capacity to produce of all gas wells in a common reservoir, and as nearly as possible, the daily volume of gas from each common reservoir that will be produced from gas wells during the following month to be utilized as permitted in this Article. Upon such determination, the Commission, based upon evidence introduced at such hearing, shall allocate to each gas well producing gas from such common reservoir a percentage of the daily productive

capacity of each well which may be produced
daily during the following month from each
gas well producing gas from such common reser-
voir. Such percentage of the daily producing
capacity of each well shall be regarded as its
daily allowable production of such daily vol-
ume required for utilization from such common
reservoir. The daily allowable production
of each gas well shall be computed and allo-
cated as provided in Sections 13 and 14."

In this Section, the Legislature provided that
the Commission "shall allocate to each gas well" a "per-
centage of the daily productive capacity of each well
which may be produced daily during the following month."
"Such percentage...shall be regarded as its daily allow-
able production." Any flexibility in determining this
"percentage" is constricted by those mandatory factors
enumerated in Section 13, infra.

The "daily allowable production" or "percen-
tage" is to be computed and allocated in accordance with
Sections 13 and 14 of Article 6008, V. C. S., providing
as follows:

"Sec. 13. In determining the daily allow-
able production for each gas well the Commis-
sion shall take into account the size of the
tract segregated with respect to surface po-
sition and common ownership upon which such gas
well or wells are located; the relation be-
tween the daily producing capacity of each gas
well and the aggregate daily capacity of all
gas wells producing the same kind of gas in
the same common reservoir or zone; and all other
factors which are pertinent; provided that the
Commission shall not take into account the
size of the tract upon which any gas well or
wells are located in excess of the efficient
drainage area of such well or wells, producing
at twenty-five per cent (25%) of the daily pro-
ductive capacity, which drainage area shall be
determined by the Commission. In ascertaining
the drainage area of a well, the Commission
shall take into account such factors as are
reflected in the productive capacity of a gas
well, including formation pressure, the

permeability and porosity of the producing
formation, and the well bore's structural po-
sition, together with all other factors taken
into account by a reasonably prudent operator
in determining the drainage area for a gas
well.

"Sec. 14. It shall be the duty of the
Commission, after notice and hearing, to as-
certain and determine the reasonable market
demand for gas from gas wells to be used for
light and fuel purposes and for all other law-
ful purposes to which sweet gas may be put
under the terms of this Article and by proper
order to restrict the production of gas from
all gas wells in said field producing such gas
to an amount equal to market demand or to an
amount which may be produced without waste as
otherwise defined; provided, however, the pro-
duction of such gas shall in any event be
restricted to the amount of the reasonable mar-
ket demand therefor. In such order the Com-
mission shall allocate, distribute or apportion
the total allowable production from such field
among the various gas wells affected by the order
on a reasonable basis, and as provided in Sec-
tion 13. It shall likewise be the duty of the
Commission to prorate the daily gas well pro-
duction of sour gas produced from each common
reservoir of sour gas in this State. The hear-
ing for such purpose shall be held at the same
time as the hearing pertaining to the proration
of sweet gas well production. The proration
of sour gas well production shall be accom-
plished according to the manner and method
herein provided for the proration of sweet
gas well production."

The phrase "all other facts which are pertinent"
in Section 13, supra, must be interpreted in accordance
with those factors preceding. We cannot include within
this phrase any power within the Commission commensurate
with the power you propose to exercise in your proposed
amendments. The phrase has reference to factors similar
to the "size of the tract", "drainage area", etc.

In Section 14, supra, the Commission is to
allocate "the total allowable production" from such field
among the various gas wells on a "reasonable basis" and

as provided in Section 13. This is a standard for the Commission. It must consider the factors outlined in Section 13 and allocate that production among those wells on "a reasonable basis" so as to prevent waste and/or protect correlative rights. It must do so to prevent discrimination in allocation among gas wells of that "total allowable production".

In this connection Article 6049d, Section 4, V. C. S., provides as follows:

"Sec. 4. Whenever the full production, from wells producing gas only, from any common source of supply of natural gas in this State is in excess of the reasonable market demand, the Railroad Commission shall inquire into the production and reasonable market demand therefor and shall determine the allowable production from such common source of supply, which shall be the reasonable market demand which can be produced without waste, and the Commission shall allocate, distribute or apportion the allowable production from such common source of supply among the various producers on a reasonable basis, and shall limit the production of each producer to the amount allocated or apportioned to such producer."

The Commission is, therefore, to "limit the production of each producer to the amount allocated or apportioned to such producer."

Your procedure is, therefore, outlined by statute and your duties provided. If the conditions are met as prescribed in Section 11, supra, on or before the 20th of each month, you are to hold a hearing, after proper notice, for the purpose of determining the "aggregate daily capacity to produce of all gas wells in a common reservoir" and the "reasonable market demand for gas from gas wells that may be produced from the reservoir to be utilized as permitted" in Article 6008. (Sections 11 and 12, supra) Upon this determination you are to allocate to each gas well producing gas from the common reservoir, "a percentage of the daily productive capacity of each well which may be produced daily during the following month." Such percentage is "its daily allowable production". Factors to be used in your determination of this "daily allowable production" are outlined in Section 13, supra. By Article 6049d, Section 4, supra, you are to "limit the production of each producer to the amount allocated or apportioned to such producer."

An accurate formula for the allocation of market demand, pursuant to those legislative standards, would ordinarily effectuate the protection of correlative rights and/or the prevention of waste. The conditions you describe do not necessarily imply that the present formula is ill-designed for the effectuation of those purposes if the conditions are the result of individual pipe lines attempting to fulfill their contractual obligations or markets, taking gas only from their connections. Contractual obligations do not determine correlative rights. See Edgar, et al, v. Stanolind Oil & Gas Co., (Civ. App. 1935) 90 S. W. (2d) 656, 658, writ ref.; F. A. Gillespie & Sons Co. v. Railroad Commission, (Civ. App. 1942) 161 S. W. (2d) 159, 163, writ ref. want merit; Railroad Commission v. Fain, (Civ. App. 1942) 161 S. W. (2d) 498; Corzelius v. Harrell, (Civ. App. 1944) 179 S. W. (2d) 419, aff., (Sup. Ct. 1945) 186 S. W. (2d) 961; Henderson v. Thompson, (Sup. Ct. 1937) 300 U. S. 258, 266. Under an accurate formula of allocation, whether market demand is rigid or fluctuating, those purposes (correlative rights and prevention of waste) will be accomplished, for the allocation "percentage" will remain stable, variation will be in the amount.

The effectuation of production under the allocation remains with the operator. All the Commission can do is allocate the market demand reasonably and in accordance with legislative standards to effectuate the purposes of the act. This was the intent of the Legislature. We cannot attribute an intent of the Legislature to provide powers which are expressly denied in Section 16, infra, the mandates of preceding Sections, and further without the contemplation of the Legislature as gathered from Article 6008.

Section 16, Article 6008, V. C. S., provides as follows:

"Sec. 16. It shall be unlawful for any person to produce gas from a gas well as herein defined in excess of the daily allowable production in such schedule of allowable production. The rate of production from any gas well shall be deemed to be the average daily rate of production for the month."

A "schedule", as long issued by the Railroad Commission, is an enumeration of the various producers

within a given field, providing therein the authorized daily allowable production for the ensuing month. Section 16 makes "unlawful" any "excess" production of gas over that authorized "daily allowable production in the schedule."

Section 16 is a blanket prohibition and negatives any implied power to permit acts which would be in violation thereof. The statute is unambiguous. In such case, the proper rule of construction is the plain import and intent of the words.

The provisions of Article 6008, heretofore discussed, compel the preparation of a schedule for the ensuing month, providing precisely the authorized daily allowable for each well. The proposed amendment would license violations of that "schedule." Section 16, supra, specifically prohibits that violation and makes "excess production" (authorized under the proposed amendment) "unlawful."

Section 18 of Article 6008, V. C. S., provides as follows:

"Sec. 18. When unforeseen contingencies increase the demand for gas required by any distributor, transporter or purchaser to an amount in excess of the total allowable production of the wells to which he is connected, such distributor, transporter or purchaser is authorized to increase his take ratably from all such wells in order to supply his demand for gas, provided, however, that notice of such increase and the amount thereof shall be given to the Commission within five (5) days; and provided further that the Commission, at its next hearing, shall adjust the inequality of withdrawals caused by such increase in fixing the allowable production of the various wells in the common reservoir or zone."

This Section authorizes increased excess production on "unforeseen contingencies," creating by statute an exception to Section 16, supra. This increase in production over the authorized daily allowable must be balanced the month following.

Section 19 of Article 6008, V. C. S., provides as follows:

"Sec. 19. If the Commission finds upon consideration of the evidence introduced at a hearing that either or both of the purposes designated under Section 10 of this Article may be more adequately accomplished by zoning a common reservoir, the Commission shall zone such common reservoir. If the Commission zones such common reservoir, each zone shall be regarded as a separate common reservoir in making allocations of daily allowable production as provided in this Article. The Commission shall allocate to each zone its just proportion of the market demand for gas from the common reservoir, and shall establish appropriate rules and regulations applicable to each zone and shall have the right to adjust its orders to the practicable conditions which exist and to enter any reasonable order which is necessary to effectuate the purpose of this law. The Commission is expressly authorized to segregate a sour gas area from a sweet gas area and shall not be required to restrict the allowable production of the sour gas zone to the same percentages that may be produced from the sweet gas zone."

If you have been unable to devise a formula for the allocation of production, protecting thereby correlative rights and/or preventing waste, the Legislature has specifically authorized the Commission upon a finding that those purposes "may be more adequately accomplished by zoning" to zone "such common reservoir." Broad power is granted the Commission in the effectuation of these purposes when a common reservoir is zoned. While we do not have the necessary facts to determine the question, this may be the solution to the conditions now existing in the Carthage Field. This determination is within the province of the Commission.

The essence of Section 19, supra, supports the view we have taken of the powers of the Commission. The Legislature provided in this Section alternative means for the effectuation of the purposes of Article 6008. If you determine that neither the statutory formula nor zoning will accomplish the purposes of our conservations laws in the Carthage Field, then a change in the present laws by the Legislature is the only solution.

We answer your first question in the negative.

In view of this opinion, your second and third questions do not require answers.

### SUMMARY

The Railroad Commission of Texas is without power under Article 6008, V. C. S., et seq., to authorize by rule or order the balancing of over and under production of the legally prescribed gas allowable (with proviso for maximum daily and monthly allowable) for a period of a year.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By     Elton M. Hyder, Jr.
                Assistant

EMH:jt

The foregoing opinion was considered and approved in conference composed of Assistant Attorneys General Fagan Dickson, Joe Greenhill; Douglas Pruett, F. D. Brown, and Special Assistant James D. Smullen.

Price Daniel
Attorney General
Chairman of the Conference